UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK ADAMCZYK,

Plaintiff,

v.

**DECISION AND ORDER**
07-CV-523S

NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES,

Defendant.

## I. INTRODUCTION

Plaintiff Mark Adamczyk commenced this employment discrimination action by filing a Complaint in the District Court for the Western District of New York. (Docket No. 1.) Therein, he alleges that Defendant New York State Department of Correctional Services discriminated against him based on his race (Caucasian). Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (hereinafter, "Title VII") and the New York State Human Rights Law, N.Y. Exec. L. §§ 296 et seq. (hereinafter, "NYHRL").

Presently before this Court is Defendant's Motion for Summary Judgment seeking dismissal of the Complaint in its entirety.[1] (Docket No. 19.) Plaintiff opposes the motion.[2] For the reasons stated below, Defendant's motion is granted.

[1] In support of its Motion for Summary Judgment, Defendant filed a Memorandum of Law; Rule 56 Statement of Undisputed Facts; Declarations of Kim Murphy, Esq. and Peter Brown, with Exhibits; Declaration of Martin Kearney; Reply Declarations of Kim Murphy, with Exhibits, and Peter Brown; and Reply Memorandum of Law.

[2] In opposition to Defendant's motion, Plaintiff filed a Memorandum of Law; Rule 56 Statement of Facts in Dispute; Plaintiff Declaration; and Attorney Affirmation, with Exhibits.

## II. BACKGROUND

### A. Facts

Plaintiff was hired by Defendant New York State Department of Correctional Services (hereinafter, "DOCS") in 1985 as a correction officer. (Pl. Aff. ¶ 3.) He was assigned to Wende Correctional Facility (hereinafter, "Wende") from 1986 until 1993. (Id. ¶ 4.) Plaintiff was promoted to sergeant in 1993 and was assigned to other correctional facilities within New York State. (Id.) He returned to Wende in 1997, was promoted to lieutenant in 2001, and remained at Wende until his termination in 2005. (Id. ¶¶ 4-6.) Plaintiff's job title in September 2005 was Watch Commander, making him the highest ranking officer during the 3 pm -11 pm shift after facility administrative officers left at around 5pm. (Id. ¶ 8.)

During the relevant time period, Plaintiff was a member of the New York State Correctional Officers and Police Benevolent Association (hereinafter, "Union"), which operates pursuant to the Collective Bargaining Agreement (hereinafter, "CBA") it entered into with the State, governing the terms and conditions of employment. (Pl.'s Ex. KK, PERB Decision, p. 1.)

On the morning of September 22, 2005, an inmate named Catus, who was housed on C-Block at Wende, made a threat against Correction Officer (hereinafter, "CO") Dennis Martin. (Pl. Aff. ¶ 16.) Superintendent Zon (hereinafter, "Supt. Zon") issued a misbehavior report and directed that Catus be evaluated by the Office of Mental Health. (Id. ¶ 18; Pl.'s Ex. Q, Inmate Misbehavior Report, Sept. 22, 2005; Pl.'s Ex. R.) Supt. Zon then notified Captain Kearney (hereinafter, "Capt. Kearney") of the threat. (Pl.'s Ex. R.)

Prior to the start of the 3pm-11pm shift, Capt. Kearney met with the staff, including Plaintiff and CO Martin, for the daily briefing. (Def.'s Stmt. ¶ 9; Def.'s Ex. B, Tr. 22:5, 13-16, Oct. 7, 2005.) He reported that inmate Catus made a threat against CO Martin and as a result was "not going anyplace." (Kearney Dec. ¶ 3; Def.'s Ex. B, Tr. 7:11, Oct. 7, 2005.) At that time, Catus was a keep-locked inmate, meaning he could only leave his cell for specific reasons stated in DOCS directives and policies. (Pl. Aff. ¶ 27.) One of the officers asked if Catus could come out for a keep-lock shower, which was authorized under the policy. (Def.'s Ex. B, Tr. 10:8-9, Oct. 7, 2005.) Plaintiff, who was standing next to Capt. Kearney replied, "I don't have a problem." (Id. 10:11-12.) He looked at the Captain, who did not give an affirmative answer, but simply shrugged his shoulders. (Id. 10:10-11, 11:1.) Plaintiff further stated to the officer, "Okay, just be careful." (Id. 11:2.) Plaintiff then told CO Martin that if Catus was out of his cell there should be another officer present to back him up. (Id. 11:4-14; Def.'s Ex G, PERB Opinion and Award, p. 10.)

Around 4:00 pm, CO Martin opened the C-Block gallery gate and entered the gallery to pass out mail at the same time Catus was out of his cell for his shower. (Pl. Aff. ¶ 53.) An altercation ensued between CO Martin and inmate Catus. (Id. ¶ 54.) After CO Martin sounded his personal alarm, CO Eric Hunt, CO Rhyreef Patton, and Sgt. Addison came to assist in subduing and restraining the inmate. (Id. ¶¶ 55-56.) Both CO Martin and Catus sustained injuries. (Id. ¶ 57.) Plaintiff completed an "Unusual Incident Report" and directed all staff involved to complete mandated reports. (Id. ¶¶ 60, 63; Pl.'s Ex. T.) He also contacted Capt. Kearney, who was the Officer of the Day, to apprise him of the "unusual incident." (Pl. Aff. ¶ 61.)

The DOCS Inspector General's Office (hereinafter, "IG's Office") conducted an

independent investigation and concluded Plaintiff was insubordinate and violated a direct order from Capt. Kearney when he let the inmate out of his cell. (Def.'s Ex. F, IG Investigative Report, p. 3.) The IG's Office also found Plaintiff filed a false report and made false statements when questioned under oath, claiming the Captain did not give direction for inmate Catus to be removed from the security of his cell. (Id.) Moreover, it found CO's Martin, Hunt, and Patton removed Catus from his cell and intentionally assaulted him. (Id.) The CO's were also found to have filed false reports and made false statements under oath. (Id.) The IG's Office recommended the case be forwarded to the Bureau of Labor Relations. (Id.)

Due to the findings of the IG's Office, DOCS's Labor Relations Office suspended Plaintiff without pay on October 11, 2005.[3] (Brown Dec. ¶ 6; Def.'s Ex. C.) On October 14, 2005, Plaintiff was issued a Notice of Discipline (hereinafter, "NOD") recommending termination. (Brown Dec. ¶ 7.)

Plaintiff, through his Union, grieved the NOD, seeking dismissal of all charges, reinstatement, and make-whole remedy. (Def.'s Ex. G, PERB Opinion and Award, p. 4.) A grievance hearing was held in front of a Public Employment Relations Board (hereinafter, "PERB") arbitrator on January 6, 2006. (Id. p. 3.) Plaintiff was represented by counsel. (Brown Dec. ¶ 9.) Both parties were allowed to present witnesses and submit documentary evidence and briefs. (Id.) Thereafter, the arbitrator denied the grievance, finding Plaintiff was guilty of charges contained in the NOD and there was probable cause for his

---

[3] The suspension was pursuant to § 8.4(a)(1) of the CBA, which states an employee may be suspended without pay where "there is probable cause that such employee's continued presence on the job represents a potential danger to persons or property or would severely interfere with its operations." (Brown Dec. ¶ 6; Def.'s Ex. E.)

suspension without pay. (Def.'s Ex. G, PERB Opinion and Award, p. 13.) The arbitrator recommended Plaintiff be dismissed from service. (Id.)

Under the CBA, "[t]he disciplinary arbitrator's decision with respect to guilt or innocence, penalty, or probable cause for suspension. . . shall be final and binding upon the parties..." (Def.'s Ex. D, § 8.2(h).) Peter Brown, DOCS's Director of the Bureau of Labor Relations, terminated Plaintiff effective March 25, 2006. (Brown Dec. ¶ 12; Def.'s Ex. H.) Plaintiff wrote to DOCS Commissioner Glenn Goord and Governor Pataki, asking them to intervene. (Pl. Aff. ¶ 101; Pl.'s Ex. SS.) Commissioner Goord replied that they would not alter the arbitrator's award, pursuant to DOCS policy. (Pl. Aff. ¶ 102; Pl.'s Ex. TT.)

CO's Martin, Hunt, and Patton, all African Americans, also received NODs recommending termination. (Def.'s Ex. F, IG Investigative Report, p. 3; Brown Dec. ¶ 14.) CO Martin and CO Hunt were suspended without pay on November 28, 2005. (Pl.'s Ex. KK, PERB Decision, pp. 9, 10.) The State withdrew its case against CO Patton since it determined he was not present during the incident with Catus. (Pl.'s Ex. WW, Declaration of W. James Schwan, Esq.) On December 9, 2009, the Union grieved CO Martin and CO Hunt's NODs. (Pl.'s Ex. KK, PERB Decision, p. 10.) Their grievance hearings were held in May 2006 in front of a different PERB arbitrator. (Id. p. 1.)

As to CO Martin, the arbitrator found the State did not have probable cause to suspend him, as he violated only Charge Number 2 in the NOD, in that he failed to take proper security measures when he left the end gate open while Catus was out of his cell. (Id. p. 11.) CO Martin's penalty was to pay a $1,000 fine. (Id.) He was reinstated and made whole for lost wages and benefits in accordance with the CBA. (Id. p. 19.)

As to CO Hunt, the arbitrator similarly found the State did not have probable cause to suspend him. (Id. p. 12.) The arbitrator noted CO Hunt was ordered to give aid to CO Martin when Catus was given a keep-lock shower and he properly followed that directive. (Id.) CO Hunt was found not guilty on all charges stated in the NOD and was reinstated and made whole for lost wages and benefits in accordance with the CBA. (Id. pp. 19-20.)

**B. Procedural History**

Plaintiff filed his Complaint with the Clerk of this Court on August 9, 2007. (Docket No. 1.) DOCS filed an Answer thereto on October 1, 2007. (Docket No. 6.) DOCS filed the instant Motion for Summary Judgment on April 15, 2009. (Docket No. 19.)

## III. DISCUSSION AND ANALYSIS

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where “the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the

motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970). Summary judgment is proper "only when reasonable minds could not differ as to the import of evidence." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." Id.

**B. Plaintiff's Discrimination Claim**

The Court will consider the Title VII and NYHRL discrimination claims together, as they are analyzed under the same standard. Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2nd Cir. 2006) ("The standard for liability under [state human rights laws] are the same as those standards under the equivalent federal anti-discrimination laws."). Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1); Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003). It is now well settled that where a plaintiff does not come forward with direct evidence of discrimination, the Court shall apply the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and Texas Dep't of Comt'y Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

The burden-shifting test first requires that the plaintiff establish a *prima facie* case of discrimination. If the plaintiff meets this initial burden, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. Burdine, 450 U.S. at 254. If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)).

Assuming that the defendant meets its burden at the second stage, the burden returns to the plaintiff to prove that the defendant's discrimination was intentional. In this regard, the plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42. "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Id. However, "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of

intentional discrimination." Id. (quoting St. Mary's, 509 U.S. at 519).

**1. *Prima Facie* Case**

In general, to state a *prima facie* case, a plaintiff must show that (1) he is a member of a protected class, (2) he is qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination. Weinstock, 224 F.3d at 42 (citing McDonnell Douglas, 411 U.S. at 802). DOCS concedes Plaintiff suffered an adverse employment action when he was terminated, but argues Plaintiff fails to establish the rest of the elements in his *prima facie* case.

**a. Member of a Protected Class**

In the case at bar, Plaintiff claims reverse discrimination, as he is Caucasian and therefore not a member of a minority group. Of course, the Supreme Court has held all race-based discrimination is prohibited under Title VII, whether it is African American or Caucasian. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 278-79, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (Title VII is not "limited to discrimination against members of any particular race."). However, Caucasian plaintiffs are not able to satisfy the first prong of the McDonnell Douglas *prima facie* case, given that they cannot establish membership in a minority group in the same way an African American can. Seils v. Rochester City School Dist., 192 F.Supp.2d 100, 108 (W.D.N.Y. 2002).

The Second Circuit has yet to expressly adopt a test for determining whether a non-minority plaintiff qualifies as a member of a protected group. Tappe v. Alliance Capital Management L.P., 177 F.Supp.2d 176, 181 (S.D.N.Y. 2001). Other circuit courts are split

on the issue. For instance, the Parker v. Baltimore & Ohio R.R. Co. "background circumstances" test is followed by the Seventh, Eighth, and Tenth Circuits. 652 F.2d 1012, 1017 (D.C.Cir. 1981). The Third Circuit rejected that test in Iadimarco, and instead requires the plaintiff to "present sufficient evidence to allow a fact finder to conclude that his employer is treating some people less favorably than others based upon a trait that is protected under Title VII." Iadimarco v. Runyon, 190 F.3d 151, 161 (3rd Cir. 1999).

DOCS urges the Court to apply the Parker "background circumstances" test. (DOCS Memo., p. 6.) Absent direction from higher courts, the Court is not inclined to apply a higher standard of proof for reverse race discrimination plaintiffs, such that they need to show the defendant is that "unusual employer who discriminates against the majority." Olenick v. New York Telephone / A NYNEX Co., 881 F.Supp.113, 114 (S.D.N.Y. 1995). A plaintiff's burden to establish a *prima facie* case is supposed to be a minimal one. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000); see also, Burdine, 450 U.S. at 253 (stating the burden is "not onerous").

Regardless of the test used, Plaintiff has failed to establish a *prima facie* case of reverse race discrimination since he has failed to show an inference of discrimination

**b. Qualified for the Position**

To satisfy the second prong, Plaintiff need only demonstrate he "possesses the basic skills necessary for performance of [the] job." Powell v. Syracuse Univ., 580 F.2d 1150, 1155 (2nd Cir. ), cert. denied, 439 U.S. 984, 99 S.Ct. 578, 58 L.Ed.2d 656 (1978).

DOCS argues Plaintiff's termination was justified because he was "insubordinate," and therefore not qualified to hold his position. (DOCS Memo., p. 9.) DOCS's argument

is misplaced, as the "qualification" requirement of the McDonnell Douglas test "refers to the criteria the employer has specified for the position." Thornley v. Penton Publishing, Inc., 104 F.2d 26, 29 (2nd Cir. 1997); see Owens v. New York City Housing Authority, 934 F.3d 405, 409 (2nd Cir. 1991) ("misconduct" does not necessarily establish "unsatisfactory performance," as an employee can commit some misconduct and still, in the aggregate, perform satisfactorily). "In effect, a plaintiff need only show a 'basic eligibility' for the position, and not the greater showing that [his] performance is satisfactory to the employer." Walker v. New York City Dept. of Corrections, No. 01 Civ. 1116, 2008 WL 4974425, at * 13 (S.D.N.Y. Nov. 19, 2008) (citing Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2nd Cir. 2001)).

Plaintiff was employed by DOCS for twenty years. He began as a correction officer in 1985, became sergeant in 1993, and made lieutenant in 2001. (Pl. Aff. ¶¶ 3-6.) Plaintiff has received positive performance evaluations since 1986, which note good appearance, attendance, professionalism, timely and accurate completion of assignments, and efficiency. (Def.'s Ex. G, PERB Opinion and Award, p. 12; Pl.'s Ex. PP.) He also received Certificates of Appreciation for exemplary attendance and commendations in 1986 and 2004. (Def.'s Ex. G, PERB Opinion and Award, p. 12; Pl.'s Ex. QQ.) Given Plaintiff's years on the job and promotion through the ranks, the Court finds Plaintiff provided sufficient evidence he was qualified to be a DOCS lieutenant. See, Meri v. Dacon, 759 F.2d 989, 995 (2nd Cir. 1985) ("courts must refrain from second-guessing a business's decisionmaking process."). Thus, Plaintiff has satisfied the second element of his *prima facie* case.

**c. Inference of Discrimination**

To complete his *prima facie* case, Plaintiff would then have to show that the circumstances of the alleged adverse employment action give rise to an inference of discrimination. Evidence showing that the plaintiff was treated "less favorably than other similarly situated employees outside [the] protected group" is one method of raising an inference of discrimination. Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003). When employing this method, the other employees to whom a plaintiff compares himself must be "similarly situated" in all material respects and must have engaged in comparable conduct for which they were treated differently. Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992). The facts and circumstances of the similarly situated individual need not be identical, but only bear a "reasonably close resemblance" to those of the plaintiff. Graham v. Long Island R.R., 230 F.3d 34, 40 (2nd Cir. 2000).

Plaintiff argues he was disparately treated because of his race and lists a number of incidents in which he claims Capt. Kearney exercised discretion over the discipline of employees and showed favoritism of African American employees over White employees. (Pl.'s Memo., p. 10.)

DOCS argues Plaintiff was treated the same as the officers involved in the September 22, 2005 incident, who are all African American. (Def.'s Memo., p.10.) After the incident, DOCS issued everyone involved a NOD suspending them and recommending termination. (Id.) Then, in accordance with the CBA, Plaintiff and the officers asked for grievance hearings. After the hearings, Plaintiff's arbitrator determined he should be

terminated while the COs' arbitrator recommended reinstatement. (Id.) DOCS states it was not involved in the arbitration process and treated all officers the same regardless of race. (Id.)

The Court finds Plaintiff has not provided sufficient evidence to support a finding that he and COs Martin, Hunt, and Patton were similarly situated. First, they were not all subject to the same workplace standards of conduct. Plaintiff was a lieutenant and the other three were correction officers. Plaintiff, as a lieutenant and watch commander, was the highest-ranking security officer on-site after facility administrators left Wende. (Pl. Aff. ¶ 9.) He was responsible for enforcing DOCS's policies and overseeing security and civilian staff at Wende. (Id. ¶ 10.) In case of emergency or other unusual event, Plaintiff was the one who contacted the Officer of the Day to appraise them of the situation. (Id.) The lower ranking correction officers had less responsibility.

Plaintiff also failed to show the circumstances surrounding their conduct was similar. Plaintiff received three previous NODs while employed with DOCS. (Def.'s Stmt. ¶ 5.) The first, issued August 1, 1991, was for loud, disrespectful, and abusive speech toward a superior, Lt. Bates. (Def.'s Ex. A, Notice of Discipline, Aug. 1, 1991.) The second, issued June 10, 1992, was for further loud and aggressive behavior culminating in a verbal confrontation with Lt. Bates. (Def.'s Ex. A, PERB Decision, Oct. 29, 1993.) The third, issued February 19, 1998, was for failing to properly supervise an inmate transportation movement and falsifying written statements. (Def.'s Ex. A, Notice of Discipline, Feb. 19, 1998.) Plaintiff has not introduced any evidence that CO Martin and CO Hunt received previous NODs. Because Plaintiff's previous NODs were a consideration in the arbitrator's decision and there is no indication that CO Martin and CO Hunt had similar disciplinary

histories, a rational factfinder could not conclude they were similarly situated. (Def.'s Ex. G, PERB Opinion and Award, p. 12.)

Moreover, even if the Court were to assume that Capt. Kearney favored African American employees, the circumstances in this case differ. Here, Plaintiff was given an NOD by DOCS, not Capt. Kearney. Furthermore, an arbitrator rendered a decision terminating him, which was final and binding under the CBA. Thus, it was not within DOCS's discretion to reverse the arbitrator's decision, and it was certainly not within Capt. Kearney's discretion.

Clearly, Plaintiff was disciplined more harshly than the COs because he was terminated and they were not. However, because Plaintiff has not shown he is similarly situated to the COs, he has failed to raise an inference of discrimination and has not made out his final element of his *prima facie* case.

**2. Defendant's Legitimate, Non-Discriminatory Reason**

Even if Plaintiff had succeeded in establishing his *prima facie* case, DOCS has offered a legitimate, non-discriminatory reason as to why Plaintiff was terminated and Plaintiff fails to show the reason is mere pretext for actual unlawful discrimination.

DOCS avers that it was the arbitrator who found that Plaintiff was insubordinate and gave false testimony to cover up that insubordination. (Def.'s Memo., p 11.) DOCS reasonably relied on the arbitrator's findings and determination, especially in light of the IG's Office's investigation, and terminated Plaintiff in accordance with the CBA. (Id.) Furthermore, DOCS maintains that Capt. Kearney had no authority to terminate Plaintiff and was not involved in the decision. (Id. p. 13.)

The Court finds DOCS has articulated a legitimate, non-discriminatory reason for terminating Plaintiff. Pursuant to the CBA, an independent arbitrator, whose decision is final and binding, ruled against Plaintiff. DOCS had no authority to alter the arbitrator's decision. This is compelling evidence that DOCS was not motivated by any discriminatory animus whatsoever. Reasonable reliance on the arbitrator's decision is all that DOCS must show, it does not need to show the arbitrator's findings were correct. See Graham, 230 F.3d at 44 (defendant "need not show that the result of the drug test was actually correct, but only that it reasonably relied on the [lab's] test results" to sustain its employment decision.); see also, Smith v. Chrysler Corp., 155 F.3d 799, 806-07 (6th Cir. 1998) ("[T]he employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.")

In an attempt to put forth evidence that DOCS's proffered reason for terminating him is false and that discrimination was the real reason, Plaintiff argues DOCS pursued disciplinary charges against him even though the IG's Office failed to apply standard interrogation techniques while interviewing Capt. Kearney. (Pl.'s Memo., p. 25.) Although Plaintiff takes issue with the way the IG's Office's investigation was conducted, this is not enough to defeat summary judgment. See, Kolesinkow v. Hudson Valley Hosp. Center, 622 F.Supp.2d 98, 112 (S.D.N.Y. 2009) (finding, "in the absence of evidence that Defendants acted in bad faith. . . or treated other employees differently... complaints about the adequacy of [Defendant's] investigation, even if accepted as true, cannot show pretext or defeat a summary judgment motion). Plaintiff further argues that DOCS had the power to reject the arbitrator's recommendation, but has offered no evidence of same. (Pl.'s Memo., p. 25.)

Plaintiff's final argument is that Capt. Kearney focused blame on Plaintiff as soon as he heard about the incident, instead of focusing on CO Martin's actions. (Pl.'s Memo., p. 22.) Plaintiff's attempt to point blame at CO Martin is to no avail. Both Plaintiff and CO Martin, as well as the other officers who violated DOCS policies, were given NODs recommending termination. Then, the IG's Office, the Bureau of Labor Relations, and the arbitrators objectively analyzed the involvement of Plaintiff and the other officers in the incident. Plaintiff cannot now point to CO Martin's wrongdoing to distract from his own.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No.19) is GRANTED consistent with this Decision and Order.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: March 10, 2011
Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court